**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TERENCE VALENZUELA, M.D., )
)
        Plaintiff, )
)
vs. )
)
HARVEY W. MEISLIN, M.D., et al., )
)
        Defendants. )
)

No. CIV 08-232-TUC-CKJ

**ORDER**

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment [Doc. # 25] and Defendants' Cross-Motion for Summary Judgment [Doc. # 28]. In Plaintiff's response, Plaintiff requests oral argument. However, the Court finds this matter is suitable for decision without oral argument. *See Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memorandum of law and evidence in support of their position, ordinarily oral argument would not be required).

*Factual and Procedural Background*

Plaintiff Terence Valenzuela, M.D. ("Dr. Valenzuela"), asserts that he has been employed by the State of Arizona Board of Regents ("ABOR") for teaching and research at the University of Arizona College of Medicine ("COM") since 1985. Dr. Valenzuela also asserts that he was dually employed by University Physicians Incorporated ("UPI") for clinical practice since 1985. UPI subsequently changed its name to University Physicians Healthcare, Inc. ("UPH"). Defendants assert that Dr. Valenzuela's employment with the

University of Arizona ("the University") is conditioned upon his being a member of UPH.

Defendant Harvey W. Meislin, M.D. ("Dr. Meislin"), was employed by ABOR as head of the Department of Emergency Medicine ("DEM") in COM at the time of the acts complained of in this action. Defendant Keith Joiner, M.D. ("Dr. Joiner"), was employed by ABOR as Dean of COM at the time of the acts complained of in this action.

In 1991 Dr. Valenzuela was awarded tenure as an Associate Professor at COM; Dr. Valenzuela was promoted to Professor at COM in 1997.[1] Dr. Valenzuela's employment responsibilities with ABOR as a tenured Professor at COM require him to provide teaching and research services; this included the teaching of residents, non-residents, and nurse practitioner students. Dr. Valenzuela's notices of appointment provide that he is subject to the ABOR conditions of Faculty Service and the University Handbook for Appointed Personnel ("UHAP"). The UHAP states:

> An individual who holds a tenured appointment is assured that the President shall offer an appointment to that individual for each succeeding fiscal or academic year until retirement, resignation, dismissal for just cause, or termination for budgetary reasons or for educational policy change.

UHAP, § 3.11.04.

Dr. Joiner testified that "there is no definition of the financial commitment for tenure at the University of Arizona in the [COM] or in any other department or college." Defendants' Statement of Facts ("DSOF"), Ex. 3, 12:1-4.

Dr. Valenzuela asserts that, when he was tenured, he had a state salary line assigned to his tenured position to compensate him for the teaching and research services he performs for ABOR at COM. Dr. Valenzuela asserts that he was compensated by UPI for the clinical services he provided for UPI; he was subsequently compensated by UPH for the clinical services he provided as an employee of UPH. Dr. Valenzuela asserts that neither UPI nor

---

[1]Under the policies of the ABOR, tenure is the employment status awarded by a president to a faculty member who has demonstrated excellence in teaching, research, and service in accordance with criteria established by each university. The status of tenure creates a legitimate claim of entitlement to continued employment unless the tenured faculty member is dismissed or released in accordance with ABOR Policy 6-201H., J., or K.

UPH have compensated him for the teaching and research services he provided as a tenured Professor employed by ABOR at COM. Defendants asserts that Dr. Valenzuela is not qualified to testify regarding the use of UPH funds or limitations thereon and that UPH dollars have always been used to support faculty activities, including teaching, that are interrelated. Dr. Valenzuela asserts that he continued to have a state paid salary for the teaching and research services he performed for ABOR as a tenured Professor at COM through June 30, 2007. Defendants asserts that Dr. Valenzuela did not have a state salary line assigned to him in perpetuity and that state support was not tied to tenure.

Defendants further assert that the use of state dollars to support Dr. Valenzuela's salary was up to the discretion of the department head. Indeed, Dr. Joiner testified at deposition that COM faculty's payment for teaching responsibilities is a combination of state funds, UPH fund, grant funds, and other additional sources. However, "there's no precise dividing line oftentimes between delivering clinical care and teaching so that it's understood that – that dollars are fungible and that funds can be used for different purposes." DSOF, Ex. 3, 9:20-24. Similarly, Dr. Meisner testified that teaching faculty members may be paid with UPH funds. DSOF, Ex. 2, 21:12-14

Dr. Valenzuela testified at deposition that he understood that the state dollar portion of his salary was a relatively small percentage of his salary; Dr. Valenzuela further testified that he had never been promised a specific sum of state dollars for any particular year and that he did not know of any University or ABOR policy that guarantees him a particular sum of state dollars or that a particular percentage of his salary would come from state dollars.

When Dr. Meislin became head of the DEM in 2002-03, there was no formula for distributing the department's allotment of state dollars, so Dr. Meislin unilaterally decided to distribute it mostly to tenured faculty, with a small amount going to tenure-track faculty, pending the development of a distribution plan by the Dean. In 2002-03, Dr. Valenzuela saw an increase in the amount of state dollars used to pay his salary, though his overall compensation did not increase.

In or around 2005, the COM began to implement the Arizona Med curriculum for

medical students and to develop an approach to pay faculty to teach the curriculum to medical students.  On May 16, 2006, Dr. Meislin informed the DEM faculty of a COM faculty meeting in which Dr. Joiner related a plan to reallocate state funding.  Dr. Meislin outlined the plan and said, "What this means is that significant state funding will go to the faculty that do the undergraduate and graduate level teaching—that is you!"  DSOF, Ex. 10. In a May 17, 2006, e-mail, Dr. Valenzuela asked, "What do you mean by 'significant?'" *Id*. Dr. Meislin responded, via e-mail, "$$$[.]" *Id*.

During the development of the distribution plan, Dr. Joiner sent memos to the entire COM describing the process.

On December 13, 2006, Dr. Meislin distributed an attachment showing the COM Teaching Effort Metrics to the DEM faculty.  Dr. Valenzuela received the Teaching Effort Metrics and he understood that it related to teaching the Arizona Med curriculum to medical undergraduates and graduate students and he also understood there would be dollars for those faculty who chose to do it, but he was not interested.

On February 6, 2007, Dr. Meislin sent Dr. Valenzuela an analysis of the Arizona Med teaching metrics and stated, "The Dean's effort to redistribute state dollars to Departments and their metric developed for distribution of those funds necessitates DEM to begin the process of redistributing DEM state dollars according to that analysis.  Our current style of using the state dollars to fund tenured faculty will transition to the style developed by the COM."  DSOF, Ex. 12.

Dr. Valenzuela testified at deposition that he was on notice in February 2007 that he was in danger of losing state funding and that Dr. Meislin, as department head, had the power to do what he wanted with the state dollars and other funds the department received.  On February 20, 2007, Dr. Valenzuela responded to an inquiry by Dr. Chad Viscusi about the reallocation plan by stating, in pertinent part, "You read correctly that [Dr. Meislin] can pretty much do whatever he wants with much of the 'new' state money the department will receive for teaching. So what?  We've always done it that way."  DSOF, Ex. 13.

On April 26, 2007, the department's business coordinator sent Dr. Valenzuela an e-

mail stating that, beginning on July 1, 2007, the DEM would distribute its state dollars according to the COM plan and that the state dollars that had previously been allocated to him would be reallocated to support the Arizona Med teaching effort. On April 27, 2007, Dr. Valenzuela responded, "Don't think the previously state dollars in Emergency Medicine will make much of a dent since we didn't have many" and further commented that if the department collected the revenue it was owed, "everything should be fine." DSOF, Ex. 14. On April 29, 2007, Dr. Valenzuela again responded to the business coordinator stating, "Did not Harvey have the stones to send these emails himself?" DSOF, Ex. 14.

Dr. Valenzuela asserts in his affidavit that, when he inquired of his COM Department Head in 2007 regarding the decision to deprive him of the entire salary for the teaching and research services he performs for ABOR as a tenured Professor at COM, he was told by Dr. Meislin that the decision was made by the Dean. Dr. Valenzuela further states in his affidavit that Dr. Joiner was the Dean of COM in 2007. In his deposition, Dr. Joiner testified that the department heads determine what faculty salaries are going to be and whether to give any state salary to department members.

Dr. Valenzuela testified at deposition that he opted not to participate in the Arizona Med teaching effort. He states, in his affidavit, that he was given no notice or opportunity to respond prior to the decision being made to deprive him of his entire salary for the teaching and research services he provides for ABOR as a tenured Professor at COM. However, at his deposition, Dr. Valenzuela testified that he knew he could have filed a grievance but did not file one because he thought it would be futile.[2] Defendants assert that Dr. Valenzuela was given notice and multiple opportunities to respond.

Under the plan proposed by the COM and adopted by the DEM for the distribution of state dollars, the department received a lump sum of state dollars and allocated 70 percent of it for faculty who participated in the Arizona Med teaching effort and 30 percent of it for

---

[2]Dr. Valenzuela testified at deposition that he filed a grievance on a different issue regarding his compensation and was successful (he received a $35,000 pay increase).

department overhead. The distribution plan provided that the 70 percent dedicated to the Arizona Med teaching effort would be distributed according to the COM teaching metrics; the plan provided no state dollars for teaching or training residents.

Dr. Valenzuela's notice of reappointment for 2006-2007 provided for a base salary of $194,400.[3] Dr. Valenzuela asserts that, effective July 1, 2007, he was deprived of the entire salary for the teaching and research services he performs for ABOR as a tenured Professor at COM, although he has continued to be employed by ABOR providing teaching and research services for ABOR as a tenured Professor at COM. Dr. Valenzuela asserts that, since July 1, 2007, the only salary Dr. Valenzuela has received has been from UPH for the clinical services he provides through UPH. Defendants asserts that Dr. Valenzuela's net salary did not change and that Dr. Valenzuela continued to benefit indirectly from state dollars. In fact, Defendants assert that Dr. Valenzuela has received his full salary from the University and that his salary was derived from sources that included UPH. Dr. Valenzuela's notice of reappointment for 2007-2008 provided for a base salary of $194,400.[4] Dr. Valenzuela's notice of reappointment for 2008-2009 provides for a base salary of $229,000.

Dr. Valenzuela asserts that Drs. Meislin and Joiner did not follow the procedures in ABOR Policy 6-201H., J., or K for his dismissal or release. He further asserts that there was no good cause to dismiss or release him from his tenured faculty position. Defendants dispute this assertion to the extent that Dr. Valenzuela claims to have been dismissed or released from his tenured faculty position.

On April 3, 2008, Dr. Valenzuela filed a Complaint against Drs. Meislin and Joiner

---

[3]Defendants assert that Dr. Valenzuela's compensation for 2006-2007 was $204,222.95, of which $174,763.89 came from UPH and the rest from a state account.

[4]Defendants assert that Dr. Valenzuela received no direct state funding in 2007-2008 but received $199,564.11 from UPH and $14,050.00 from another account for a total annual compensation of $213,614.11. Dr. Valenzuela asserts that, after July 1, 2007, the funding he received was from UPH. Dr. Valenzuela asserts that the other account referred to by Defendants was also a UPH account ("UPH Kino Resident Teaching). Dr. Valenzuela asserts he was a member of the UMC faculty and not a UPH Kino faculty member.

alleging unlawful deprivation without due process of his property interest in his tenured faculty position protected under the Fourth and Fourteenth Amendments of the United States Constitution.[5]

On June 23, 2009, Dr. Valenzuela filed a Motion for Partial Summary Judgment. A response and reply have been filed. On June 26, 2009, Drs. Meislin and Joiner filed a Motion for Summary Judgment. A response and reply have been filed.

*Relevant Policies*

The parties have discussed various provisions of the ABOR Policy. The ABOR Policy on the Conditions of Faculty Service provide, *inter alia*:

6-212 College of Medicine Faculty

A.     The University of Arizona College of Medicine encompasses two full, four-year medical-education programs: The University of Arizona College of Medicine in Tucson (Tucson campus) and The University of Arizona College of Medicine – Phoenix in partnership with Arizona State University (Phoenix campus). The College strives to provide health education and patient care to all Arizonans, in metropolitan and rural areas alike, from the borderlands Arizona shares with Mexico to Native American communities in the northern regions of the state.

B.     The faculty status of any paid voting member of the Tucson campus, who provides health care services, is conditioned upon such health care services being provided only as a member or employee of University of Arizona Physicians Healthcare (UPH), except that no such requirement of membership or employment with UPH shall be imposed if UPH determines that any such member of the faculty is ineligible for membership or employment with UPH. Faculty members who provide health care services solely at a veterans administration hospital, whose salaries are provided through that entity, are not required to have membership or employment with UPH.

C.     The faculty status of any paid voting member of the Phoenix campus faculty, who provides health care services, shall not be conditioned upon such health care services being provided as a member or employee of any UA-affiliated faculty practice plan, until such time and unless ABOR determines that a faculty practice plan for the Phoenix campus should be implemented.

Policy 6-212.

---

[5]Also included as defendants are the spouses of Drs. Meislin and Joiner. An Amended Complaint including the spouse of Dr. Valenzuela and an Answer to the Amended Complaint were subsequently filed.

The University's 2000 University Handbook for Appointed Personnel ("UHAP") provides, *inter alia*:

> All grievances or complaints by or against appointed personnel shall be filed with and addressed first by the immediate administrative head of the individual about whom the grievance or complaint is made. All grievances or complaints shall be filed in writing no later than 90 days from the date on which the grievant or complainant becomes aware of the matter which gives rise to the grievance or complaint, except for compensation.
>
> Grievances or complaints regarding compensation shall be filed no later than 30 days from the date the grievant or complainant receives notice of the matter which gives rise to the grievance or complaint.
>
> The administrative head shall review the grievance or complaint and develop any factual information required for a decision on the matter. The administrator may consult with standing committees or appoint a special committee or an individual to investigate the matter. The administrator shall communicate his or her decision in writing to the grieving or complaining party and to the party against whom the grievance or complaint is made, stating the factual basis and reasons for the decision.
>
> Within 10 days after receipt of the administrator's decision, the grieving or complaining party may appeal the decision to the next administrative level. Additional factual development may be undertaken at the next administrative level if deemed necessary. The decision at that next administrative level is not subject to further administrative review except as otherwise provided in this chapter.

UHAP, § 6.02.

*Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510, internal quotes omitted. The nonmoving party must demonstrate a dispute "over facts that might affect the outcome of the suit under

the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, the disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23. In opposing summary judgment, a party is not entitled to rely on the allegations of his pleadings, Fed.R.Civ.P. 56(e), or upon conclusory allegations in affidavits. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992).

The dispute over material facts must be genuine. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly supported summary judgment motion must set forth specific facts demonstrating a genuine issue for trial. *Id.* Mere allegation and speculation are not sufficient to create a factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511. However, the evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255. Further, in seeking to establish the existence of a factual dispute, the non-moving party need not establish a material issue of fact conclusively in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d 626, 631 (9th Cir. 1987).

Additionally, the Court is only to consider admissible evidence. *Moran v. Selig*, 447 F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991) (declarations and other evidence that would not be admissible may be stricken). Moreover, "at the summary judgment stage, courts do not focus on the admissibility of the evidence's form. [Courts] instead focus on the admissibility of its contents." *Marceau v. International Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1141-42 (D.Ariz. 2009).

A "genuine" issue of "material" fact cannot be created by a party simply making

assertions in its legal memoranda. *Varig Airlines*, 690 F.2d at 1238. Declarations and other evidence that would not be admissible may be stricken. *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991). Indeed, a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007), *citation omitted*. Moreover, statements must allege personal knowledge. *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that is not based on personal knowledge is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand summary judgment."); *see also Block v. Los Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975), *quoting Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2nd Cir. 1969) ("[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). Additionally, the court is to review the record as a whole, but must disregard evidence favorable to the moving party that the jury is not required to believe and must give credence to the uncontradicted and unimpeached evidence of the moving party, at least "'to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51, 120 S.Ct. 2097, 2110 (2000), *citation omitted*.

The objections/disputes place the statements in context and clarify them. The Court overrules the objections, but will only consider the admissible evidence that is supported by specific facts that may show a genuine issue of material fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

*Exhaustion of Administrative Remedies as Jurisdictional Requirement*

Defendants assert that, where state administrative remedies are adequate to protect a person's due process rights, a person cannot state a § 1983 claim for denial of those rights

when he has failed to avail himself of those remedies. *Brogan v. San Mateo County*, 901 F.2d 762, 764 (9th Cir. 1990); *Correa v. Nampa Sch. Dist. No. 131*, 645 F.2d 814, 817 (9th Cir. 1981). Dr. Valenzuela points out that the Ninth Circuit has stated:

> The Supreme Court has explained that "exhaustion of state administrative remedies is not a prerequisite to an action under § 1983." *Patsy v. Bd. of Regents*, 457 U.S. 496, 507, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *see also Knight v. Kenai Peninsula Borough Sch. Dist.*, 131 F.3d 807, 816 (9th Cir.1997) ("Congress imposed only a limited exhaustion requirement on actions brought under 42 U.S.C. § 1983, as this case was. The statute requires exhaustion only when brought by prisoners.

*Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). In *Patsy*, the Court concluded that exhaustion of state remedies is not required as a prerequisite to bringing a § 1983 action. Similarly, the court in *Outdoor Media Group* was addressing exhaustion as a requirement for the court's jurisdiction. To any extent that Defendants are asserting that this Court does not have jurisdiction based on a failure to exhaust, the Court finds Dr. Valenzuela's failure to exhaust his administrative remedies does not preclude his § 1983 claim.

*42 U.S.C. § 1983 – Unlawful Deprivation of a Property Interest without Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *Richardson v. City and County of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997). "By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions." *Daniels v. Williams*, 474 U.S. 327, 331-332, 106 S.Ct. 662, 665 (1986). "[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708 (1998). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

The elements of proof necessary for a claim under 42 U.S.C. § 1983 for unlawful deprivation without due process of a property interest protected under the Fifth and Fourteenth Amendments of the United States Constitution are: (1) a protectable property interest and (2) denial of adequate procedural protections. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005). Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). However, there must be a showing of a liberty or property interest that is protected by the Constitution. *Wedges, Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

Dr. Valenzuela asserts that, under Arizona law, he had a property interest in his tenured faculty position. *See Peacock v. Board of Regents of Universities and State Colleges of Arizona*, 380 F.Supp. 1081, 1087 (D.Ariz. 1974) ("It is so clear as to require no citation to authority that a tenured professor has a protected property interest.").[6] Defendants do not dispute this assertion.

Dr. Valenzuela further asserts that his protected property interest extends not simply to continued employment but also to his right to be paid wages for the services he performed as a tenured professor. Defendants agree that it is generally true that an employee, tenured or not, has a right to wages. In fact, Defendants assert that it is undisputed that Dr. Valenzuela received his wages – each year, the University agreed to pay Dr. Valenzuela a salary that was stated in his notice of reappointment, the University issued those paychecks,

---

[6]Defendants assert that, to the extent Dr. Valenzuela claims he was deprived of a property interest in continued employment, Dr. Valenzuela has admitted he has not been terminated by the University. Dr. Valenzuela asserts that he has not claimed that he was dismissed from his job at the University. Dr. Valenzuela's claim, as set forth in the November 6, 2008, Joint Report, is that Defendants deprived "Dr. Valenzuela of his property interest in the compensation for his services of teaching and research as provided by the state salary line assigned to his tenured position by entirely eliminating for the fiscal year 2007-2008 the total compensation that Dr. Valenzuela received for his services of teaching and research." Joint Report, p. 3.

and the compensation Dr. Valenzuela received provided him with the entire salary specified in his notice of reappointment. Defendants argue that this evidence precludes summary judgment in favor of Dr. Valenzuela on his claim that he was deprived of wages.

Dr. Valenzuela asserts that the United States Supreme Court has made it clear that a person's interest in a benefit is a protected property interest:

> We have made clear . . . that 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699 (1972), *citations omitted*. He also asserts that Arizona has repeatedly held that wages are a property interest protected by the due process clause. *Piatt v. MacDougall*, 773 F.2d 1032, 1036, 1037 (9th Cir. 1985) ("[b]ecause Arizona has established, by statute, a right of inmates to compensation for work performed for private parties, it cannot deny that right to Piatt after he has earned the wages, without affording him due process of the law[;]" "[the] state was under a constitutional obligation not to deny Piatt his wages without affording him a meaningful opportunity to be heard at the time the wages were due").

Dr. Valenzuela asserts that the United States Court of Appeals for the Ninth Circuit has held that "[t]his standard does not require specific binding precedent to show that a right is clearly established." *Ostlund v. Bobb*, 825 F.2d 1371, 1374 (9th Cir.1987), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2016, 100 L.Ed.2d 603 (1988). The protected property interest in employment clearly includes the wages from that employment. *See e.g. Piatt* (inmates have a property right to receive a minimum wage); *Hale v. State of Ariz.*, 967 F.2d 1356, 1371 (9th Cir. 1992); *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir.1991) (property right to wages where the requirements of Arizona law for receiving minimum wages is met).

Defendants assert that, although Dr. Valenzuela does not mention it in his argument, he is apparently claiming that he was deprived of a "state salary line." Defendants interpret Dr. Valenzuela's position as that he performs teaching and research services for the

University and clinical services for UPH. In his view, any compensation he receives for teaching and research must come from state sources while compensation for clinical work must come from UPH. Defendants asserts that this compartmentalization ignores the fact that, like other physician faculty members, Dr. Valenzuela is obligated to join UPH as a condition of his employment with the University because he is providing health care services.[7] Further, as a member of UPH and of the COM, Dr. Valenzuela works regular shifts as an attending physician in the UMC Emergency Department. Defendants asserts that, in that capacity, Dr. Valenzuela is involved in patient management and interactive instruction of residents and students, has teaching responsibilities every time he works a shift in the Emergency Department (which is his classroom) . . . Defendants assert that Dr. Valenzuela's clinical responsibilities and his teaching responsibilities are inextricably intertwined. Defendants assert that Dr. Valenzuela receives a paycheck from the University to compensate him for the services he performs and there is no distinction drawn between compensation for clinical services and compensation for teaching and research.

Dr. Valenzuela disputes these assertions of Defendants and asserts that it is clearly established that physicians employed by the ABOR to teach and to conduct research as faculty of the COM are not state employees when providing health care services to the public:

> University Physicians, Inc. ("UPI") is a nonprofit corporation formed in 1984. UPI employs physicians ("Physicians") who provide health care services to the public. Physicians also are employed by the State of Arizona Board of Regents to teach and to conduct research as faculty of the University of Arizona College of Medicine.
>
> As employees of the Board of Regents, Physicians are provided liability insurance coverage pursuant to A.R.S. sections 41-621 to -625 (1992 & Supp. 1993) when acting as state employees.FN1 Until July 1, 1993, Physicians also were provided liability insurance coverage for acts or omissions in providing health care services to the public even though they were not acting as state employees.

---

[7]A review of Policy 6-212, upon which Defendants rely for their assertion, does not establish that Dr. Valenzuela was obligated to join UPH. Rather, the Policy provides that faculty members may also provide health care services at a veterans administration hospital. However, the policy makes clear that Tucson faculty who provide health care services, with a few exceptions, are to provide those health care services though UPH.

*State, Dept. of Administrative Risk Management Div. v. University Physicians, Inc.*, 182 Ariz. 262, 263, 895 P.2d 1025, 1026 (App. 1994). However, in *University Physicians*, the court specifically stated that the capacities in which the physicians were working were "in this case." Furthermore, *University Physicians* did not address how, in each of those capacities, the physicians were compensated. The Court finds that *University Physicians* does not establish that physicians employed by the ABOR to teach and to conduct research as faculty of the COM receive a specified separate compensation for those services.

Dr. Valenzuela asserts that Defendants deprived him of a property interest he had in his employment with ABOR as a tenured professor when they stopped his payment by ABOR for the research and teaching duties he performed in his employment with ABOR. He asserts it is irrelevant to his claim whether his other employer, UPH, continued to pay him for the clinical duties he performed in his employment with UPH or whether UPH gave him a raise because of the revenues he was generating from his clinical duties. Rather, Dr. Valenzuela asserts that he had a property interest in being compensated for his services of teaching and research in his tenured faculty position which was the entire salary he received as an employee of ABOR and that Defendants deprived Dr. Valenzuela of that property interest by entirely eliminating the total compensation that he received for his services of teaching and research.[8]

Defendants assert that the primary inquiry in determining whether he had a sufficient expectation of receiving state funding to create a property interest depends on the extent to which there is a relevant rule or statute restricting the discretion of the decisionmaker. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 758-60 (2005) (holding that plaintiff had no protectable property interest in police enforcement of restraining orders because under

---

[8]Dr. Valenzuela's claim is that his entire teaching and research salary was eliminated, not that it was reduced.

state law police retained discretion); *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990). If "the decision to confer a benefit is unconstrained by 'particularized standards or criteria,' no entitlement exists." *Id., citations omitted.*

Defendants assert that Dr. Valenzuela has not identified any statute or policy that regulates how state dollars are used or must be used in the COM or the DEM. Rather, he admitted that he knows of no University or ABOR policy that guarantees that a specific sum or percentage of his pay would come from state dollars. Further, Dr. Meislin testified that when he became head of DEM, there were no guidelines or policies concerning the use of state dollars to support faculty salaries, and that state dollars were not reserved for any particular purpose or particular faculty members. Defendants also point out that Dr. Valenzuela himself once remarked that Dr. Meislin "could do pretty much whatever he wants" with the state dollars and then added, "So what? We've always done it that way." DSOF, ¶¶ 37-38.

In support of his claims that UPH provided compensation for clinical services and did not compensate him for teaching and research services, Dr. Valenzuela relies on his own assertions in his affidavit. Furthermore, Dr. Valenzuela's affidavit relays a conversation between himself and Dr. Meislin:

> When Dr. Valenzuela inquired of his COM Department Head in 2007 regarding the decision to deprive Dr. Valenzuela of the entire salary for the teaching and research services he performs for ABOR as a tenured Professor at COM, he was told by Defendant Harvey W. Meislin, M.D., that the decision was made by the Dean.

Plaintiff's Statement of Fact, Ex. 1, ¶ 20. Because Dr. Valenzuela's question contained a presupposition, it is unclear if Dr. Meislin was agreeing that Dr. Valenzuela had been deprived of his teaching and research salary and that the decision had been made by Dr. Joiner or if Dr. Meislin was only stating that salary decisions were made by Dr. Joiner.

In the context of false testimony/oath charges, some courts have determined that, "[a]bsent fundamental ambiguity or impreciseness in the questioning, the meaning and truthfulness of declarant's answer is for the jury." *United States v. Robbins*, 997 F.2d 390, 395 (8th Cir. 1993), *citing United States v. Wolfson*, 437 F.2d 862, 878 (2nd Cir. 1970).

However, in this case, other statements of Dr. Valenzuela raise questions as to the presupposition in Dr. Valenzuela's statement. Indeed, Dr. Valenzuela testified at deposition that he did not believe he was guaranteed the same amount in state dollars every year, he did not know of any ABOR policy that guaranteed him a particular sum of state dollars, he did not know of any University policy that guaranteed him a particular sum of state dollars, he did not know of any ABOR policy that guaranteed that a specific percentage of his salary would come from state dollars, he did not know of any University policy that guaranteed that a specific percentage of his salary came from state dollars, and he did not know of any ABOR or University policy that required that compensation for his University activities come solely from state dollars. Dr. Valenzuela also testified that Dr. Meislin, as department head, had the power to do what he wanted with the state dollars and other funds the department he received.

The Court considers that Dr. Valenzuela's affidavit, including reference to the discussion with Dr. Meislin, lacks any factual details or supporting evidence to establish that UPH only provided compensation for clinical services and did not compensate him for teaching and research services. *See Nilsson*, 503 F.3d at 952 n. 2; *see also Skillsky*, 893 F.2d at 1091.

Similarly, the evidence presented by Defendants is through deposition testimony of a party (Dr. Meislin), who was actually responsible for distribution of compensation to Dr. Valenzuela and others:

> Q: Is there a breakdown between the payment that comes as an employee of UPH and the payment that comes as an employee of University of Arizona?
>
> A: Very dynamic, changes almost every year for every faculty member.
>
> Q: Okay. And is that breakdown based in any way on the services that the doctor provides for UPH as distinct from the services the doctor provides for the University of Arizona?
>
> A: Not necessarily, because a service to University of Arizona may flow through a UPH account. For example, we get some trauma readiness funds that used to come through a UPH account prior to about two years ago, now runs through – same fund of money now runs through a U of A account.
>
> We've had certain hospital contracts that have run through UPH and now run through

U of A, and vice versa. We've had contracts that – so there was a – there's always just kind of some definition of what a – why an account – why a fund should run through a UPH account versus a U of A account, and it kind of comes down into whether you need malpractice insurance to function in that role.

There's also money that becomes, I guess, somewhat discretionary on my part, that as department chair I have funding that may run through a UPH account, it may through a U of A account, and I can give it to people to try to enhance their year-end balance, their salary, and I have discretion over those dollars.

Q:    So there is no amount that represents the salary that a person receives for their services as a University of Arizona professor –

A:    No.

Q:    – as distinct from a UPH employee?

A:    No, it's never been my understanding that there is a – either a guaranteed or a fixed sum of dollars that relates to a professorial appointment.

Q:    Is there any payment at all that's identified as this is your payment as a University of Arizona professor as distinct from a UPH employee?

A:    Well, the accounts identify the source of the funding, whether it would be a state account or whether it would be a University Physicians account, and I guess within that it would – it would be sub-identified as what type of state account or what type of University Physicians account.

Q:    Would it be accurate to say that the money that comes from the 900150 relates to the work that the doctor performs as a clinical practitioner as distinct from the teaching and research roles that they perform as a U of A professor?

A:    No, sir. They're intermingled. And again, it depends on whether the funds flow through. So, for example, we have graduate medical eduction funding that comes into the department through a UPH account, not a U of A account, and we have graduate medical education funding that comes through a U of A account, not a UPH account. So that distinction, that fine line, doesn't exist.

Q:    So the faculty member doing teaching might be getting aid with UPH funds to do the teaching?

A:    Yes.

DSOF, Ex. 2, 19:2-21:14; *see also* DSOF, Ex. 3, 9:20-24, 12:1-4 (Dr. Joiner's deposition).

Additionally, Dr. Meislin stated in an affidavit that he had broad discretion in allocating funding from various sources to benefit the DEM faculty. Defendants' Response to Plaintiff's Statement of Facts ("DRPSOF"), Ex. 2, ¶ 11. Dr. Meislin's testimony indicates there is no set ABOR or University policy as to what funding is used to pay for teaching and research services.

The parties have presented self-serving statements to support their positions. However, Defendants' statements are also made as the administrators responsible for making compensation decisions. Dr. Valenzuela's statement to Dr. Viscusi that Dr. Meislin "can pretty much do whatever he wants with much of the 'new' state money the department will receive for teaching. So what? We've always done it that way[,]" DSOF, Ex. 13, indicates that Dr. Valenzuela recognized the discretionary nature of the source of compensation and that it was the established practice. Additionally, the lack of any policy that regulates the allocation of funding, in and of itself, supports a reasonable inference that the decisions regarding the allocation of funding are discretionary. While evidence of a nonmoving party is to be believed and all justifiable inferences are to be drawn in his favor, *Anderson*, 477 U.S. at 255, the relevant facts are to be determined and inferences drawn in favor of nonmoving party "*to the extent supportable by the record*[.]" *Scott v. Harris*, 550 U.S. 372, 127 S.C.t 1769, 1776 n. 8, 167 L.Ed.2d 686 (2007). Summary judgment is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for a nonmoving party. Fed.R.Civ.P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed.R.Civ.P. 50(a).

Where, as here, a plaintiff has not provided any facts (other than his self-serving, conclusory statements) to support a proposition (i.e., that Dr. Valenzuela had a property interest in receiving compensation from a specific state fund) essential to his claim, the Court cannot find that there is an evidentiary basis for a reasonable jury to find in his favor. Defendants have presented evidence that Dr. Valenzuela cannot identify any University or ABOR policy supporting his claim that UPH did not compensate him for teaching and research services. Dr. Valenzuela has not set forth specific facts disputing this; therefore, Dr. Valenzuela has not shown a genuine issue for trial is presented. *See Anderson*, 477 U.S. at 248 (once moving party has met its burden demonstrating absence of genuine issue of material fact, opposing party may not rest on mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial); *see also*

*Matsushita Electrical Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (to resist summary judgment, non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts"). While Dr. Valenzuela need not show that a right is clearly established, *Ostlund*, 825 F.2d at 1374, Dr. Valenzuela has not shown any relevant rule or statute restricting the discretion of Dr. Meislin such that a genuine issue for trial has been presented. *See Castle Rock*, 545 U.S. at 758-60; *Allen*, 911 F.2d at 370. A factual dispute that requires a jury or judge to resolve the parties' differing versions of the truth at trial has not been established. *See T.W. Elec. Serv.*, 809 F.2d at 631. The Court finds there is no genuine issue of material fact that Dr. Valenzuela was entitled to receive payment from state funds to compensate him for his teaching and research services has been presented. *See Allen*, 911 F.2d at 370 (if "the decision to confer a benefit is unconstrained by 'particularized standards or criteria,' no entitlement exists"), *citations omitted*. Accordingly, no genuine issue of material fact that Dr. Valenzuela was deprived of a property interest has been presented. Summary judgment in favor of Defendants on this basis is appropriate.

*Qualified Immunity*

Defendants also assert that they are entitled to summary judgment on the basis of qualified immunity. Government officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The defense of qualified immunity allows for errors in judgment and protects "all but the plainly incompetent or those who knowingly violate the law . . . [I]f officers of reasonable competence could disagree on the issue [whether or not a specific action was constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Qualified immunity balances the interests of "the need to hold public officials accountable when they exercise power irresponsibly and the

need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, — U.S. — , 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). The Court must determine "whether, in light of clearly established principles governing the conduct in question, the [public officer] objectively could have believed that his conduct was lawful." *Watkins v. City of Oakland*, 145 F.3d 1087, 1092 (9th Cir. 1998).

When qualified immunity is asserted at the summary judgment stage, the Court would historically consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *see also Billington v. Smith*, 292 F.3d 1177, 1183 (9th Cir. 2002). If not, then "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. If a constitutional violation is revealed, the "the next, sequential step is to ask whether the right was clearly established." *Id.* A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, 533 U.S. at 202, 121 S.Ct. at 2156. If a constitutional violation occurred, the issue becomes whether the law officer could have reasonably believed that the officer's conduct was lawful. Generally, this is a mixed question of law and fact requiring a determination regarding whether an objectively reasonable officer would have believed that exigent circumstances existed to justify the force used in light of the information possessed by defendant. *Id.*, 533 U.S. at 205-206, 121 S.Ct. at 2158-2159. However, the United States Supreme Court recently determined that the sequence set forth in *Saucier* is not mandatory and that district courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818.

Any genuine issues of material fact concerning the underlying facts of what the public official knew or what the public official did are questions of fact for the jury. *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1149 (9th Cir. 1996), citing *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995). However, where

the essential facts are undisputed, the reasonableness of the public official's actions is properly determined by the court. *Sinaloa Lake Owners Ass'n*, 70 F.3d at 1099. In this case, the essential facts are undisputed.

The Court's determination that a genuine issue of material fact that Dr. Valenzuela was deprived of a property interest has not been presented, *see Castle Rock*, 545 U.S. at 758-60; *Allen*, 911 F.2d at 370, is sufficient to establish that Defendants are entitled to qualified immunity. Given the undisputed facts of this case (i.e., there is no University or ABOR policy that establishes where funding for compensation for teaching and research services comes from) and in light of the clear consensus that Dr. Meislin could "pretty much do whatever he want[ed]" with the funds, DSOF, Ex. 13, a reasonable person in Defendants' positions could have believed that their conduct was lawful. *See Watkins*, 145 F.3d at 1092. Under either *Saucier* prong, therefore, Defendants are entitled to qualified immunity. The Court finds Defendants are entitled to summary judgment on this basis.

Accordingly, IT IS ORDERED:

1.      Plaintiff's Motion for Partial Summary Judgment [Doc. # 25] is DENIED.

2.      Defendants' Cross-Motion for Summary Judgment [Doc. # 28] is GRANTED.

3.      Judgment is awarded in favor of Defendants and against Plaintiff.

4.      The Clerk of the Court shall enter judgment and shall then close its file in this matter.

DATED this 30th day of October, 2009.

_____
Cindy K. Jorgenson
United States District Judge